IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FRED BOUDREAU, trustee on behalf of the CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE WORKERS UNION (INDEPENDENT) HEALTH AND WELFARE FUND, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 07 C 5273 |
| JAMES GENTILE, an individual, MIDLAND TRANSPORTATION GROUP, INC. f/k/a MIDLAND TRANSPORTATION, INC., MIDLAND LOGISTICS, INC., MIDLAND TRANSPORTATION SERVICE GROUP, LTD., STELLMAN DIRECT, INC., USMDS, INC., MIDLAND DIRECT, INC., MIDLAND DIRECT TRANSPORTATION GROUP, INC., MIDLAND DIRECT GROUP COMPANY, MIDLAND CONTAINER TRANSPORT COMPANY, MIDLAND INTERMODAL COMPANY, and U.S. MAIL DELIVERY SYSTEMS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund (the "Fund") and Fred Boudreau ("Boudreau"), the Fund's trustee and fiduciary, filed a five count complaint under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and the Labor Management Relations Act ("LMRA"), 20 U.S.C. § 141 *et seq*, against Midland Transportation Group, Inc. f/k/a Midland Transportation, Inc. ("Midland Transportation Group"), Midland Logistics, Inc.

("Midland Logistics"), Midland Direct, Inc. ("Midland Direct"), U.S. Mail Delivery Systems, Inc. ("U.S. Mail Delivery"), USMDS, Inc. ("USMDS"), Midland Transportation Service Group, Ltd. ("Midland Transportation Service Group"), Stellman Direct, Inc. ("Stellman Direct"), Midland Direct Transportation Group, Inc. ("Midland Direct Transportation Group"), Midland Direct Group Company ("Midland Direct Group"), Midland Container Transport Company ("Midland Container"), Midland Intermodal Company ("Midland Intermodal")(collectively, the "Corporate Defendants"), and James Gentile ("Gentile"), the sole officer, director, and shareholder of the Corporate Defendants. Gentile was also the sole officer, director, and shareholder of Stellman, Inc. ("Stellman"), a bankrupt, non-party.

Midland Transportation Group, Midland Logistics, Midland Direct, and U.S. Mail Delivery are or were at some point engaged in the business of providing trucking, shipping, freight forwarding, and transportation brokerage services. USMDS is a real estate holding company, with no transportation related operations. The remaining corporate defendants are or were at all times non-operating holding companies, existing without assets, employees, or active business operations. Defendants Midland Transportation Group, Stellman Direct, and U.S. Mail Delivery all involuntarily dissolved in 2008.

Plaintiffs seek to hold Gentile and the Corporate Defendants liable for benefit contributions allegedly owed to the Fund, having accrued between January 1, 2002 and December 31, 2007 in the amount of $791,153.00. Plaintiffs move for summary judgment on all counts.[1] The motion is granted.

I.

The Fund is a multi-employer welfare benefit plan governed by ERISA, which receives contributions for and provides benefits to covered employees pursuant to collective bargaining agreements ("CBA") between employers and unions. In short, the CBAs bind employers to the Fund's trust agreement, which requires them to contribute to the Fund on behalf of covered employees. In return, those employees are eligible for benefits under Fund plans, as are their dependents.

The Fund works on a self-reporting system that requires a participating employer to identify a base group of employees for whom contributions are due. Thereafter, the employer is required

---

[1] Plaintiffs also move to strike defendants' Local Rule ("LR") 56.1 additional facts and their response to plaintiffs' LR 56.1 statement of facts. I disregarded the numerous statements and responses that consist of hearsay, speculation, legal conclusions, improper argument, and evasive denials, in addition to those that do not properly cite to the record, are unsupported, or are otherwise improper. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006) ("district courts are entitled to expect strict compliance with Local Rule 56.1"); *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)(no abuse of discretion in striking responses consisting of evasive denials and improper argument). Therefore, plaintiffs' motion to strike is moot.

to notify the Fund on a monthly basis of any changes in the employment status (*e.g.*, termination, new hire, etc.) of individuals covered by the CBA. The Fund relies on work history reports from employers to prepare monthly remittance reports, which detail contribution amounts owed for covered employees.

Stellman, prior to its bankruptcy filing in August 2007, was a unionized trucking business whose four to eight bargaining-unit employees drove trucks and worked under the terms of CBAs negotiated on their behalf by two different unions – the Chicago Truck Drivers, Helpers, and Warehouse Workers Union ("CTDU") and later Teamsters Local Union No. 710 ("Local 710") when CTDU merged with Local 710 (collectively, the "union"). Gentile, the only person authorized to execute agreements on behalf of Stellman and the Corporate Defendants, entered into three CBAs with the union, effective April 1, 1998 through March 31, 2003, April 1, 2003 through March 31, 2007, and April 1, 2007 through March 31, 2011, respectively.[2] Gentile signed the 1998 and 2007 CBAs on behalf of Stellman. The 2003 CBA references Stellman as the employer in the preamble, but Gentile wrote "Midland" in the employer signature block. All three CBAs focus on the "trucking industry" and cover "all local cartage operations of the Employer." Pursuant to the CBAs, only bargaining unit employees are allowed to perform covered

---

[2] Plaintiffs say they never received a copy of the 2007 CBA and challenge the authenticity of the document submitted by defendants in their exhibits.

work and the subcontracting, transfer, leasing, diversion, assignment, or conveyance of covered work is prohibited.

From January 1998 through May 2007, the Fund received work history reports from Stellman, which in turn were used to determine contribution amounts due under the CBAs and trust agreement. Those amounts due were then submitted to Stellman by the Fund by way of remittance reports. Stellman never paid contributions to the Fund itself, but rather checks for the amounts due were issued by various Corporate Defendants, namely, Midland Transportation, Midland Transportation Group, Midland Stellman, Midland Logistics, and "Midland."

In 2006, after Stellman fell several months behind in payments, the Fund sued to collect the delinquent amounts and moved to compel an audit. The resulting audit for the period from January 1, 2002 through March 31, 2007 found Stellman owed the Fund $101,423.00. When the Fund attempted to collect, it learned that Stellman had not conducted business for over five years and had no assets, income, documents, or employees. Stellman filed for bankruptcy about a week later.

The Fund then sued the Corporate Defendants and moved to have them audited. This second audit revealed, among other things, that many of the individuals who were reported to the Fund as having performed covered work for Stellman actually worked for various

Corporate Defendants. Moreover, a number of the reported personnel were not truck drivers.

In the present action, plaintiffs seek Fund contributions owed for truck drivers located within the jurisdiction of the CBAs. Although the parties agree that at least Stellman was liable for delinquent contributions to the Fund, they dispute whether Gentile and/or the Corporate Defendants are liable in Stellman's stead. Defendants also dispute the claimed amount of contributions owed.

## II.

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *National Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

I must construe all facts in the light most favorable to the non-movant and draw all justifiable inferences in favor of that party. *See id.* at 255. However, "[i]nferences that are supported by only speculation or conjecture" are not sufficient to withstand summary judgment. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008) (citation omitted). A genuine issue for trial

exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the nonmoving party "must do more than raise some metaphysical doubt as to the material facts; [she] must come forward with specific facts showing that there is a genuine issue for trial." *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006) (citation ommitted).

III.

First, plaintiffs seek to hold the Corporate Defendants responsible for contributions owed by Stellman under single employer and alter ego theories. The single employer doctrine states that "when two entities are sufficiently integrated, they will be treated as a single entity for certain purposes." *Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998). Courts look at the following criteria in determining whether two companies constitute a single enterprise: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Id.* In general, the alter ego analysis is the same as that of the single employer doctrine, with the added element of intent to evade the employer's obligations under labor laws. *See Trustees of Pension Funds of Local 701 v. Favia Elec. Co., Inc.*, 995 F.2d 785, 788-89 (7th Cir. 1993)(internal quotation marks and citations omitted). However, meeting all the elements of

the single employer doctrine is not essential to a finding that the alter ego doctrine applies. *Id.* at 789.

It is undisputed that the Corporate Defendants share common ownership, common management, and a centralized control of labor relations. The only factor of the single employer doctrine or alter ego analysis defendants challenge is whether there was an interrelation of operations. They contend the requisite interrelation was lacking because, unlike Stellman, the Corporate Defendants do not conduct only "local cartage" operations but also conduct various other types of freight operations, namely, interstate freight operations, intrastate and/or mixed intrastate and interstate freight operations, and freight forwarding and/or freight brokerage operations. The parties dispute which of defendants freight operations constitute "local cartage" but that dispute, while relevant to the amount of contributions owed, does not mean there was no interrelation of operations between the companies for purposes of liability. *See Central States, Southeast and Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593, 598 (7th Cir. 1990)(finding alleged diversification in trucking business not sufficient to overcome alter ego status in light of other factors).

Here, contrary to defendants' contentions, the undisputed facts evidence a significant interrelation of operations among the Corporate Defendants and with Stellman. The Corporate Defendants, with the exception of USMDS, provide various trucking industry

services, including trucking, shipping, freight forwarding, and transportation brokerage services. They share some of the same customers and some of the same employees. They are also physically located at the same address, and share the same phone and facsimile numbers. USMDS, a real estate holding company, owns the property the Corporate Defendants are using and shares it with them. There is no lease agreement in place for use of the property, the Corporate Defendants do not pay USMDS rent, and Gentile is USMDS' only employee. None of the Corporate Defendants have reported assets.

Only one bank account was actively used by the Corporate Defendants between January 2002 and May 2008. Payments to personnel receiving compensation from any of the Corporate Defendants, whether reported on IRS Form W-2 or Form 1099, were all made from the same account and, for at least the last four years, accounts receivable for all the Corporate Defendants were deposited in the same account. Acknowledged payors on the account include Midland Direct, Midland Logistics, Midland Transport, Midland, Direct Midland, U.S. Mail Delivery, Midland Transportation, Midland Computers, James Gentile, and various unnamed persons/entities.

Gentile was the only person authorized to enter into agreements, including CBAs, on behalf of Stellman and the Corporate Defendants, and was the only person authorized to make employment decisions for them. When Stellman stopped operating sometime

between 2000 and 2002, some of its truck drivers began working for the Corporate Defendants. Until its bankruptcy, Stellman was at all relevant times located at the same physical address as the Corporate Defendants and shared contact numbers with them. Fund contribution amounts allegedly owed by Stellman under the CBAs were invoiced to Stellman but paid by various Corporate Defendants from their active bank account.

Defendants do not offer any explanation as to why these undisputed facts do not clearly evidence an interrelation of operations between the Corporate Defendants and with Stellman. In fact, their response points out certain facts that further supports plaintiffs' position. For example, defendants note that remittance reports were addressed to Stellman prior to October 2003, but thereafter were sent to "Stellman, Inc. (Midland Trans.)" at the same address. While defendants correctly point out that it is unclear which party initiated the administrative name change, defendants fail to explain why this fact helps their position, especially since Gentile continued to authorize payment on the invoices.

Defendants also mention that W-2 forms in the name of Vicki Andrews, Gentile's former wife, prove that she was an office employee for the Corporate Defendants. Andrews claims she never worked for the Corporate Defendants or for Stellman, but even if she did she was never eligible for benefits because she was not a

truck driver.  Defendants knew this but submitted her name on work history reports and paid Fund contributions on her behalf anyway. This fact supports plaintiffs' alter ego theory as it evidences the intent to subvert the obligations of the CBAs while reaping the benefits for Gentile's family.

Additional evidence of the intended subversion of CBA obligations is found in defendants' arguments relating to an alleged error made by Gentile when he signed the 2003 CBA.  The preamble of that agreement lists Stellman as the subject employer. But instead of writing in "Stellman" in the employer signature block, Gentile wrote "Midland."  Defendants adamantly argue that this was merely a mistake and Gentile intended for Stellman, and not any particular "Midland" corporation, to be bound, while plaintiffs argue that this mistake legally binds "Midland" to the contract.  But even if defendants are right, Gentile's "mistake" does not help them avoid liability.  The only inference a reasonable fact finder could draw here is that defendants were trying to avoid the obligations of the 2003 CBA by binding Stellman, a non-operational shell company with no employees, instead of the Corporate Defendants.  Moreover, defendants continued to submit fraudulent work history reports in Stellman's name on behalf of Corporate Defendant drivers and non-eligible office workers, including Gentile's minor children and now ex-wife,

in order to obtain benefits under the CBAs.  These undisputed facts strongly support plaintiffs' theories of liability.

Finally, without citing any authority or other support, defendants summarily state that if I do find liability under one or both of plaintiffs' theories, only those Corporate Defendants who were payors on checks issued as payment to the Fund on behalf of Stellman should be held responsible.  This undeveloped argument is not persuasive and is waived.  *See Weinstein v. Schwartz*, 422 F.3d 476, n.1 (7th Cir. 2005)(undeveloped arguments are waived).

Defendants have not provided any disputed facts relevant to the single employer or alter ego analyses that suggest summary judgment is inappropriate in this case.  Therefore, based on the undisputed facts noted above, I find the Corporate Defendants comprise a single employer and that they are alter egos of Stellman.  Accordingly, they are liable for Fund contributions owed by Stellman pursuant to the CBAs.

III.

Plaintiffs next posit that Gentile is personally liable for Fund contributions owed by Stellman.  A court may pierce the corporate veil and hold an individual officer or shareholder liable for his corporation's conduct when 1) there is such unity of interest and ownership that the separate personalities of the corporation and the individual do not exist and 2) where the circumstances are such that an adherence to the fiction of a

separate corporate existence promotes injustice or fraud. *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 463-64 (7th Cir. 1991). The corporate veil may be pierced more easily in ERISA cases than in pure contract cases. *Id.* at 461. Gentile only challenges the first part of this alter ego analysis – that there is not sufficient unity and ownership that he should be held liable for the conduct of his corporations.

Several factors are considered when determining whether there is such unity of interest and ownership to justify piercing the corporate veil, namely: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders. *Fontana v. TLD Builders, Inc.*, 362 Ill.App.3d 491, 298 Ill.Dec. 654, 840 N.E.2d 767, 778 (2005). In this case, nearly every "unity of interest and ownership" factor is present.

Gentile is the sole shareholder, officer, director, and operating officer of all the Corporate Defendants. No stock

certificates have ever issued for any of the Corporate Defendants and none of them have ever paid dividends.  Gentile testified at his deposition that he recently held an annual meeting of the shareholders and board of directors, but could not recall for which company the meeting was held or the kind of business discussed.  He also could not recall if the Corporate Defendants kept any corporate books or whether he had ever voted on a corporate matter or passed a corporate resolution.

Gentile also does not recall whether he paid an initial capitalization into the Corporate Defendants, but the articles of incorporation show that each was capitalized with the statutory minimum amount of $1,000.  There is no evidence that any additional capital contributions were made and recent annual reports show that the amount of capitalization is still $1,000 for each company.  There is no record of retained earnings for the Corporate Defendants, they have not filed tax returns since at least the year 2000, and do not maintain any financial records.  The Corporate Defendants have no assets and do not maintain general ledgers, cash disbursement records, check registers, cash receipts records, or records of accounts receivable.  Earned income records prior to December 2007 were allegedly destroyed in a flood, and according to Gentile only Midland Logistics and Midland Transportation Service Group had any earned income in 2006 and 2007.  The Corporate

Defendants all are located on property owned by USMDS, but none pay rent and there is no lease.

Defendants argue that Gentile's conduct was known and sanctioned by the union agent, and that the agent also improperly recruited non-truck drivers for union membership. Without any further elaboration, defendants suggest this relieves Gentile of any alter ego liability for non-payment of contributions. Defendants' undeveloped and unsupported argument is waived. *See Weinstein v. Schwartz*, 422 F.3d 476, n.1 (7th Cir. 2005)(undeveloped arguments are waived).

Second, defendants claim that there was no unity of interest and ownership between Gentile and the Corporate Defendants because: 1) Gentile maintained corporate formalities as required by the Illinois Business Corporation Act ("IBCA"), 2) corporate records were destroyed in a flood, and 3) plaintiffs have not shown that Gentile commingled his assets with those of the Corporate Defendants, utilized their assets as his own, or conducted personal business through the Corporate Defendants. Again, defendants cite no authority for their argument and do not elaborate on these points.

With respect to corporate formalities, Gentile only notes that the IBCA does not require the issuance of stock certificates and does not required dividends be paid. While this may be true, it is a neutral fact that does not explain why no established corporate

formalities were followed.  *See People v. V & M Indus., Inc.*, 298
Ill.App.3d 733, 233 Ill.Dec. 218, 700 N.E.2d 746, 751-52
(Ill.App.Ct. 1998) (failure to hold regular meetings, take minutes,
maintain corporate records showed failure to observe corporate
formalities); *Ted Harrison Oil Co., Inc. v. Dokka*, 247 Ill.App.3d
791, 187 Ill.Dec. 441, 617 N.E.2d 898, 902 (Ill.App.Ct. 1993)
(finding a "complete lack of corporate formalities" where "[n]o
records were kept and the company did not hold formal shareholder
or director meetings"). Next, defendants argue that certain
corporate records, including documents relating to capitalization,
stock prices, personal loans, and state income withholding reports
were destroyed in a flood.  The only support for this argument is
Gentile's declaration, which does not explain how these missing
documents help him avoid liability.

During discovery, the only documents defendants claimed were
destroyed in a flood were pre-2007 earned income statements.  For
the other documents noted in Gentile's declaration, defendants
merely stated that they did not exist or, in the case of state
withholding reports, were not filed or required.  Further, Gentile
does not provide any information on the alleged loan documents
(*e.g.*, how many loans there were, the amount of those loans, or
which Corporate Defendant(s) were given loans).  And as for
capitalization and stock prices, none of the undisputed facts
suggest the "missing" documents would provide any new or relevant

information and defendants do not suggest otherwise – Gentile is still the sole shareholder for each Corporate Defendant and recent annual reports show they all continue to be capitalized at the statutory minimum of $1,000.

Finally, defendants summarily state that plaintiffs must show that Gentile commingled his own assets with those of the Corporate Defendants, utilized their assets as his own, or conducted personal business through the Corporate Defendants in order for liability to attach. Again, this conclusory and unsupported argument is waived. *See Weinstein v. Schwartz*, 422 F.3d 476, n.1 (7th Cir. 2005)(undeveloped arguments are waived).

The undisputed facts evidence a unity of interest such that piercing the corporate veil to hold Gentile accountable for the acts of Stellman and the Corporate Defendants is appropriate.

IV.

Defendants' last arguments are directed toward the audit process and amount purportedly owed to the Fund. First, they contend that all truck drivers were hired as independent contractors or subcontractors and not "employees," and therefore contributions on their behalf were not required. Second, defendants argue that they did not conduct only "local cartage" operations, but rather also conducted interstate operations not covered by the CBAs and that the term "local cartage" is ambiguous

17

making the CBAs unenforceable.[3]   Defendants also contend that errors in the audit process incurably infect its results.

The parties hotly dispute whether the owner-operators hired by defendants to render trucking services were employees or independent contractors under the common-law test. (*See* Pls.' Mem. pp. 18-22; Defs.' Resp. pp. 11-14.)   But in light of plaintiffs' undisputed argument regarding the CBAs' prohibition on subcontracting and diversion of covered work, that distinction is irrelevant. (Pls.' Mem. pp. 23-26.)   Plaintiffs argue that even if defendants are right and the owner-operators were independent contractors and not employees, by hiring them and by subcontracting with other trucking companies for trucking services, defendants violated the CBAs and are liable for contributions that would have been owed had defendants abided by the CBAs and used "employees." *Id.*  Defendants completely fail to acknowledge or respond to this persuasive argument and therefore concede the issue.   Accordingly, to the extent non-employees provided covered trucking services, defendants are liable in the amount of Fund contributions owed had employees been used in their stead.

---

[3]   Defendants also argue that "employee" is ambiguous, but fail to explain why they believe the term means anything other than its ordinary meaning - an individual hired by defendants to drive a truck and perform CBA covered work.   The only case cited in support of this argument dealt with whether the owner of a company with no employees was considered an "employee" as that term was defined under the parties' CBA.   *Moriarity,* 164 F.3d at 330-31. That issue is not present in this case.

Defendants next two arguments are related in that they contend even if they are liable for the owner-operators and subcontractors, they are only liable to the extent those drivers performed covered work. Contract construction under Illinois law involves a two-step inquiry. *Lumpkin*, 933 F.2d at 456. First the court looks to the language of the contract. If the plain language provides an unambiguous answer to the issue in dispute, the inquiry is over. *Id.* But if the contractual language is ambiguous as to that issue, the court must then go on to declare the contract's meaning. *Id.* And where the extrinsic evidence is undisputed, the interpretation of such an ambiguous contract remains a question of law for the court to decide. *Id.*

As to the first step, the terms of a contract are ambiguous if they are susceptible to more than one reasonable interpretation. *Moriarity*, 164 F.3d at 330. But the ambiguity of otherwise clear terms can be established by extrinsic evidence. *Id.* The parties dispute the meaning of "local cartage" and each provide their own definition of that term. Defendants contend that it is "just picking up freight in Chicago and delivering it to Chicago" and even that is not "local cartage" if such a transfer is conducted in conjunction with further interstate freight operations. (*See* Defs. Resp. p. 8.) On the other hand, plaintiffs contend the term includes any freight operation that starts or terminates within the

"Area of the Agreement" regardless of whether the operation entails city, intrastate, and/or interstate transit.

Although the express language of the CBA does not clearly agree with either interpretation, it does not conflict with plaintiffs' definition but does make defendants' position patently untenable. The CBAs cover "[a]ll work of the Employer performed in the Area of the Agreement" and the "Area of the Agreement" is defined as "[t]he entire area included within a 75 mile radius of the main Post Office at Chicago, Illinois." (Pls.' Ex. 2, p. 29; Pls.' Ex. 5, p. 30; Defs.' Ex. 3, p. 33.) The Indiana, Wisconsin, and Michigan borders are all plainly located within a 75 mile radius of the main Post Office in Chicago, so city, intrastate, and/or interstate transport are all inherently covered by the agreement. The only support provided for defendants' position is Gentile's declaration, which states that none of the Corporate Defendants "just perform local cartage operations, that is just picking up freight in Chicago and delivering it to Chicago unless it is in conjunction with further interstate freight operations." (Defs.' Ex. 1, ¶ 63.) While that may be true, his declaration cannot mean interstate and intrastate operations are never "local cartage" as that would directly conflict with the language of the CBAs.[4] Left with only plaintiffs' definition, which is not

---

[4] The remaining portions of defendants' argument are literally unfinished and nonsensical. (*See e.g.*, Defs.' Resp. p. 9)("(ii) the Corporate Defendants and raises issues of material fact. and";

disputed by any noted intrinsic or extrinsic evidence, I find "local cartage" includes all freight operations originating in or terminating within the defined "Area of the Agreement."

Finally, defendants point to alleged flaws in the audit process itself in an effort to reduce their liability. First, they claim owner-operators and subcontractors should be excluded from the audit because they are not employees and defendants and subcontractors who conduct interstate operations should be excluded because they do not perform "local cartage" operations. As already discussed, defendants are all jointly liable under the single employer and alter ego theories, defendants are all liable for covered work performed by non-employees due to the CBAs' prohibitions on subcontracting and work diversion, and "local cartage" does not exclude interstate freight transport.

Defendants also claim the audit should have distinguished between employees located in Chicago and those located in California and that it did not exclude employees who were not truck drivers. Plaintiffs already conceded this point – the $791,153.00 principal amount claimed already excludes the amounts attributed to those subgroups. To the extent defendants claim the auditor's assumptions were incorrect they can only blame themselves for not keeping adequate records. Because defendants have not raised a genuine issue of material fact disputing the Fund's calculations,

and "goes to the very 'heart' of whether and how the CBAs apply to any or all of").

I accept the results of the audit. *Laborers' Pension Fund v. RES Envtl. Servs.*, 377 F.3d 735, 738-39 (7th Cir. 2004)(explaining that an absence of company records contradicting an audit report places burden on employer to establish a genuine issue of material fact as to why it does not owe the reported delinquent amount).

V.

For the foregoing reasons, I grant plaintiffs' motion for summary judgment on all counts. Defendants are jointly and severally liable in the amount of $791,153.00, plus ERISA's mandatory add-ons.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Date: August 19, 2009